Argued and submitted January 5, affirmed June 15, 2005

AERO SALES, INC.,
*Appellant,*

*v.*

CITY OF SALEM,
a municipal corporation;
and Carpenter Commercial Properties, LLC,
an Oregon limited liability company,
*Respondents.*

00C-16422; A121480

114 P3d 510

J. Michael Alexander argued the cause for appellant. With him on the briefs was Swanson, Lathen, Alexander & McCann, PC.

John E. Pollino argued the cause for respondent City of Salem. With him on the brief was Garrett, Hemann, Robertson, Jennings, Comstock & Trethewy, PC.

David A. Hilgemann argued the cause for respondent Carpenter Commercial Properties, LLC. With him on the brief was the Law Offices of David Hilgemann.

Before Haselton, Presiding Judge, and Linder* and Ortega, Judges.

HASELTON, P. J.

---

* Linder, J., *vice* Ceniceros, S. J.

## HASELTON, P. J.

This dispute concerns a 20-foot strip of land directly north of property leased by plaintiff Aero Sales, Inc., from defendant City of Salem[1] that plaintiff wishes to use to give aircraft from its hangar access to the north taxiway at Salem's McNary Field. Plaintiff appeals from a judgment, following trial, in which the trial court rejected plaintiff's alternative claims for (1) reformation of a lease agreement with defendant, (2) breach of the agreement as reformed, and (3) imposition of a constructive trust against Carpenter Commercial Properties, LLC (Carpenter), to which defendant has leased the disputed property, to require Carpenter to provide plaintiff access over that property to the north taxiway. We reject without discussion plaintiff's argument concerning its claims for breach of contract and imposition of a constructive trust. We write to address only plaintiff's arguments concerning its alleged entitlement to reformation of the lease agreement with defendant. For the following reasons, we affirm.

■■ A party seeking reformation of a contract has the burden to establish the following elements by clear and convincing evidence:

> "(1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence."

*Jensen v. Miller*, 280 Or 225, 228-29, 570 P2d 375 (1977) (citations omitted). Plaintiff asserts on appeal that it presented clear and convincing evidence of each of those elements and that the trial court erred in holding otherwise. Our review is *de novo*, but, to the extent that the trial court's factual findings were based on the credibility of witnesses, we give "substantial weight" to those findings. *Pioneer Resources, LLC v. D. R. Johnson Lumber Co.*, 187 Or App 341, 343, 68 P3d 233, *rev den*, 336 Or 16 (2003).

---

[1] For convenience of reference, "defendant" in this opinion refers solely to the City of Salem.

Consistently with that standard of review, we find the facts as follows: In 1997, defendant planned to construct a new taxiway—the north taxiway—at Salem's McNary Field, using federal and local funding sources. At that time, another taxiway, the south taxiway, already existed.

On April 24, 1998, one of plaintiff's principals, McCracken, wrote to defendant's urban development administrator, Hayden, expressing a desire to lease a specific area

"suitable to construct an 80' x 120' corporate aircraft hangar. Those dimensions may be altered slightly in conjunction with the proposed new taxi-way construction. The hangar will have doors at both ends for the ease of aircraft movement."

An attached diagram showed the proposed structure and indicated markings to both the north and the south of the proposed structure representing taxiways. The existing south taxiway abutted the property that McCracken indicated an interest in leasing, but, at that time, defendant had not determined exactly where the projected north taxiway would be located.

In July 1998, one of plaintiff's representatives, Kasper, again wrote to Hayden:

"The purpose of this letter is to address the location of the proposed taxi-way. Our needs and the needs of the corporate hangar area in general would be best met by the offset taxi-way option. This creates an area suitable for the construction of medium sized corporate hangars on the south side of the proposed taxi-way and allows for a future need for large corporate or, perhaps, commercial size hangars on the north. The centered taxi-way diminishes the usefulness of the south side and eliminates the possibility of large corporate or commercial on the north side. We would like to begin the permit and construction process in the near future, but the location of the taxi-way affects the functionality of our proposed design. While I know that the final decision on the location of the taxi-way may not come for many months, a recommendation from the Airport Commission, which has a large influence on the decision in this matter, would be enough for us to proceed with our construction."

The next day, July 8, McCracken wrote again to Hayden, stating:

> "Aero Sales proposes to construct a 125' x 90' hangar with a 65' x 20' door at each end. *The hangar will access the present taxi-way on the south side and the proposed taxi-way on the north side.* * * * The amount of ground leased would encompass the hangar with a 5' buffer around the hangar and a 35' x 90' ramp area on the south side. We would like to begin the lease and ground rent on the 35' x 90' north side ramp area upon completion of the proposed taxi-way expansion. The included drawings indicate the areas that we propose to lease and their relation to surrounding buildings."

(Emphasis added.) Hayden indicated to McCracken that it would not be possible to defer the lease of the 35-foot by 90-foot ramp area on the north side until the completion of construction of the north taxiway. Plaintiff's proposal to lease the property ultimately included the lease of the 35-foot area to the north of the hangar.

The following week, at an Airport Advisory Commission meeting, plaintiff proposed to lease property for its planned hangar, and the commission voted to approve the proposal.[2] On September 16, 1998, plaintiff entered into a 20-year lease agreement with defendant for the property described as "Hangar No. 2870 25th Street S.E., Salem, Oregon." The leased parcel abutted the existing south taxiway. However, at the time that the lease was executed, the decision on where the north taxiway would be located had not yet been made.

The lease into which the parties entered was defendant's standard form lease. The agreement provided that plaintiff would "use the said premises for the construction, maintenance, use and occupancy of an aircraft storage hangar[.]" The agreement incorporated by reference an attached map that showed the exact size and location of the parcel

---

[2] The commission itself is a body that reviews proposals and makes recommendations; it does not enter into agreements to lease property. Rather, after approval by the commission, the city attorney's office enters into negotiations and drafts lease agreements. After the parties agree to terms, the lease is then submitted to the city council for decision.

being leased. The map shows the hangar situated in the parcel, with five feet of open space on the east and west sides of the hangar, and 35 feet of open space on the north and south sides for aircraft access to the hangar doors.

The lease agreement contains no reference to the location of any taxiway in relation to the leased parcel. Specifically, we note that there is no evidence that plaintiff and defendant's representatives negotiated any terms by which plaintiff would lease additional property to the north of the proposed hangar to be used for access to the north taxiway. Plaintiff's only evidence concerning this point was testimony by McCracken that Hayden had said, in the course of discussing access to the proposed north taxiway, "If you need more, then we'll add that to your lease later." Hayden, on the other hand, had no recollection of such a conversation and testified that plaintiff had never asked for an option to expand its lease to extend to the taxiway once it was constructed. Again, the lease did not mention any access to taxiways.

Over the course of the next several months, plaintiff constructed its hangar. At the north end of its hangar, plaintiff constructed a helicopter pad that extended some 10 feet beyond the area that it had leased. Plaintiff leased the hangar to the Oregon State Police.

Meanwhile, in early August 1998, defendant was entertaining a proposal from Carpenter, which wanted to construct a large jet center at McNary Field. Carpenter indicated to defendant that the proposed north taxiway would need to be made of concrete rather than asphalt and must be of a size large enough to accommodate certain types of jets. As defendant's negotiations with Carpenter were ongoing, in early 1999, defendant decided the exact location of the north taxiway, establishing that it would be located 20 feet north of the northernmost part of plaintiff's parcel. Carpenter proposed to lease all of the property abutting the north taxiway, *including the 20-foot strip to the north of plaintiff's parcel.* At an Airport Advisory Commission meeting, Carpenter's representative, Ribera, told the commission that Carpenter did not plan on using the strip of land between plaintiff's property and the north taxiway and that there would be "no problem" with plaintiff's access to the north taxiway. From that

statement, the commissioners understood that Carpenter would permit plaintiff to use the strip to have access to the north taxiway. The commission gave preliminary approval to the Carpenter lease.

In 1999, defendant and Carpenter executed their lease. The agreement between defendant and Carpenter ultimately provided for Carpenter to provide the funds necessary to upgrade the planned north taxiway from asphalt to concrete and to make it larger than originally planned. Several months later, Carpenter constructed a fence in the area immediately north of plaintiff's property and removed the portion of the helicopter pad that encroached on its property. Carpenter's actions limited the use of plaintiff's tenant, the Oregon State Police, which had been using the north door of the hangar for helicopter access. Plaintiff and Carpenter attempted to negotiate an agreement permitting plaintiff and users of its hangar to have access to the north taxiway, but they were unable to reach an agreement. This litigation ensued.

The gravamen of plaintiff's reformation claims is that defendant knew when it leased the property to plaintiff that plaintiff intended to construct a hangar that would have access to both the existing "south taxiway" and the proposed north taxiway—that is, that both parties understood that guaranteed access to the north taxiway, wherever it was ultimately situated, was an essential condition and feature of the lease. Thus, plaintiff contends, regardless of whether the written lease explicitly recognizes such an entitlement to access, that entitlement was a fundamental, albeit implicit, term of the parties' agreement. Accordingly, in seeking reformation, plaintiff contends that the following term was erroneously omitted from the lease agreement:

"When the location of the public taxiway to the north of Plaintiff's leasehold is established, the City of Salem will either reserve access to the public taxiway to Aero Sales, Inc., in the lease to any third party that may lease land between Aero Sales leasehold and the public taxiway to the north of that leasehold, or will lease to Lessee Aero Sales, Inc., additional land, if any is required, to ensure Lessee's access to the public taxiway and upon the same lease rate

per square foot, terms and conditions, as are contained in this Lease."

The trial court termed the "central issue" with respect to reformation as follows:

"Notwithstanding the lack of any language in the lease agreement, is there sufficient evidence to establish that there existed an antecedent agreement between the City and the plaintiff to the effect that the plaintiff would be allowed to lease such additional land as necessary to secure access for the plaintiff to the north taxi-way from its hang[a]r once the exact location of the north taxi-way was established?"

The court, after rendering extensive findings, concluded:

"The bottom line in this case is that plaintiff, through its authorized representatives, who are experienced and knowledgeable businessmen, executed a lease without the necessary language to protect their right of access to the proposed north taxi-way and simply 'assumed' that they would be given some 'first right' or 'option' on the property needed at some time in the future. Plaintiff's representatives have no one but themselves to blame for the situation they now find themselves in."

The court entered its judgment in May 2003.

■    On *de novo* review, we agree with plaintiff that the evidence demonstrates unequivocally that defendant leased the property for the hangar to plaintiff with a full understanding that plaintiff planned to have access to *both* taxiways from the hangar.[3] Nevertheless, that does not confer an entitlement to reformation. Rather, the question is whether a term was omitted from the parties' lease agreement that would have ensured such access. As noted above, a plaintiff seeking reformation must prove by clear and convincing evidence that there existed an "antecedent agreement" to which the contract may be reformed. *Jensen*, 280 Or at 228.

As an initial matter, we note that there is absolutely no evidence that the parties ever *discussed* the possibility

---

[3] The trial court also found that "the City was aware of plaintiff's desire to have access to the proposed north taxi-way from its leased property prior to the execution of the lease in September, 1998."

that the "City of Salem will * * * reserve access to the public taxiway to Aero Sales, Inc., in the lease to any third party that may lease land between Aero Sales leasehold and the public taxiway to the north of that leasehold," as plaintiff's requested reformation proposes. *See* 200 Or App at 200. Much less is there any evidence that the parties reached an *agreement* to that effect. Because there is no evidence to support a determination that the parties had such an antecedent agreement, the trial court did not err in denying reformation to incorporate such a term.

Nevertheless, as noted above, plaintiff's reformation claim is disjunctive and alternative. Plaintiff also invokes an alleged antecedent agreement that defendant promised to "lease to Lessee Aero Sales, Inc., additional land, if any is required, to ensure Lessee's access to the public taxiway and upon the same lease rate per square foot, terms and conditions, as are contained in this Lease." 200 Or App at 200-01.

■      On that point, plaintiff presented evidence that one of defendant's representatives stated in the course of negotiating the lease, "If you need more [property to provide access to the north taxiway], then we'll add that to your lease later." An antecedent agreement need not, in itself, be binding in order to satisfy the test for reformation. It need not, for example, satisfy the statute of frauds. *See Pioneer Resources, LLC,* 187 Or App at 367. That is, the antecedent agreement itself need not " 'be complete and certain enough to be a contract.' " *Id.* at 367-68 (quoting *Restatement (Second) of Contracts* § 155 comment a (1981)). Nevertheless, the antecedent agreement must be sufficiently specific so that a contract can be reformed to accurately reflect the missing term.

■      In this case, the fundamental difficulty with plaintiff's putative "we'll add that to your lease later" "antecedent agreement" is that such an "agreement" lacks sufficient specificity to be cognizable in reformation. While, given the context, it is possible to infer from that statement that the object of the alleged "agreement" was a strip of land of unknown dimensions that would connect plaintiff's hangar to the proposed north taxiway in the event that that taxiway did not abut the hangar, it is impossible to discern from that statement either whether (a) defendant intended to give plaintiff

an option to lease such a parcel without any additional consideration, or (b) defendant intended to give plaintiff an option to lease such a parcel on the price terms that plaintiff now suggests. Further, and even more importantly, we cannot infer from that statement that defendant was agreeing to include any clause *in the original lease* concerning the strip of land that might eventually connect the hangar to the proposed north taxiway. Indeed, the statement that the land could be leased "later" suggests the opposite, *viz.*, that defendant did not intend to include such a term in the lease agreement and, instead, intended to postpone any agreement about the land until a later date.

■     To support reformation, plaintiff must establish that the parties had an antecedent agreement that was omitted from the contract, *i.e.*, an agreement to include something *in that specific contract* that was omitted. As we noted in *Pioneer Resources, LLC*, reformation " 'is available when the parties, *having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing.*' " 187 Or App at 370 (quoting *Restatement* at § 155 comment a (emphasis added)). Here, plaintiff failed to demonstrate, by clear and convincing evidence, that it had an antecedent agreement with defendant to include, *in the lease that plaintiff now seeks to reform*, a term concerning the property that *might* be needed to connect plaintiff's hangar to the proposed north taxiway. Rather, plaintiff's evidence indicates that, when plaintiff broached the subject, defendant successfully put off reaching any agreement about land that might eventually be needed to connect plaintiff's hangar to the north taxiway.

The trial court correctly determined that plaintiff was not entitled to reformation of its lease agreement.[4]

Affirmed.

---

[4] Given our analysis, we need not, and do not, determine whether plaintiff proved the other requisites for reformation, *i.e.*, that there was either a mutual mistake or a unilateral mistake by plaintiff coupled with "inequitable conduct" by defendant and that plaintiff "was not guilty of gross negligence." *Jensen*, 280 Or at 228-29.